# CHARLESTON.

HUKILL v. GUFFEY, et al.

Submitted June 14, 1892.—Decided December 22, 1892.

| | |
|---|---|
| 37 | 425 |
| 41 | 316 |
| 37 | 425 |
| 47 | 283 |
| 37 | 425 |
| f48 | 295 |
| 37 | 425 |
| e55 | 125 |
| j56 | 647 |
| 37 | 425 |
| 65 | 542 |
| 37 | 425 |
| 66 | 387 |

1. LEASE—FORFEITURE—RES JUDICATA.

A junior lessee brought an action of unlawful detainer against the senior lessee of an oil and gas lease for a tract of land of thirty acres. It was held that the senior lease was forfeited by its own terms by reason of the failure of such lessee to comply with the conditions thereof; that the execution of the junior lease by the lessor was a sufficient declaration of such forfeiture; that the senior lease was thus avoided by the execution of the junior lease which was good against the senior lease; that the junior lessee could maintain an action of unlawful detainer against the senior lessee in possession; and a judgment in such action in favor of the junior lessee against such senior lessee for the possession of the tract of thirty acres for oil purposes was affirmed. *Guffey* v. *Hukill*, 34 W. Va. 49 (11 S. E. Rep. 754). Afterwards the senior lessee files his bill in equity against the landlord and the junior lessees, praying, among other things, relief against such forfeiture. *Held*, the fact of the forfeiture of the senior lease is *res judicata*, and can not be brought into question and again litigated in the suit in equity. (p. 444.)

2. LEASE—FORFEITURE—DAMAGES.

The tract of land of thirty acres in controversy is situated in an oil field, at the time of the senior lease partially developed. The senior lessee, and those claiming under him, had for more than nine months failed to commence to bore for oil, and had failed to pay or deposit for the lessor the one dollar and thirty three

and one third cents per month. *Held*, under the circumstances of the case, the senior lessee, and those claiming under him, are not entitled to be relieved against the forfeiture by paying such sum. The damages to be looked to are the damages resulting from the breach of the covenant to bore for oil, and not the failure to pay one dollar and thirty three and one third cents per month in lieu thereof; and the damages resulting from the failure to do the specific thing, viz., to bore for oil, not being susceptible of pecuniary measurement, and therefore not compensable, the relief from such forfeiture is denied. (p. 447.)

3. Lease—Parol Evidence—Fraud—Contract.

Parol evidence will not be received to ingraft upon or incorporate with a valid, written contract an agreement made contemporaneously therewith and inconsistent with its terms. The fraud which will let in such evidence must be fraud in the procurement of the instrument which goes to its validity, or some breach of confidence in using a paper delivered for one purpose by fraudulently perverting it to another. (p. 449.)

*Okey Johnson, W. P. Hubbard* and *Keck, Son & Fast*, for appellant. *Berkshire & Sturgiss, A. F. Haymond* and *Alfred Caldwell*, for appellees.

O. Johnson, for appellant:

I.— *If the fact of forfeiture is not res judicata, the plaintiff ought to have the relief prayed for in the bill.*—15 S. E. Rep. 151; 2 Pom. Eq. § 880; 34 W. Va. 375; 34 W. Va. 397.

II.—*At common law and now clearly by statute a judgment in an action of unlawful detainer does not settle the title to the property, and is no bar to any subsequent action in which the title is directly involved.*—Code (1849) c. 134, s. 4; Code, c. 89, s. 4; 3 Munf. 397; 6 Munf. 433; 5 Litt. 185; 71 Cal. 428; 3 Sneed 115; 106 Ill. 189; 120 Ill. 9; 36 Kan. 604; 12 Gratt. 462.

III.—*But even if the court adheres to its opinion, that the fact of forfeiture is res judicata, still relief ought to be granted in a court of equity, because of the fraud alleged in the bill and clearly proved.*—Code, c. 126, s. 5, 6; 6 Munf. 358; 2 Rand. 426; 7 Gratt. 310; 13 W. Va. 803; 27 W. Va. 626; 21 W. Va. 456; 6 How. 114; 17 Ala. 672; 12 Wheat. 605; 2 Sto. Eq. Jur. § 894; 9 How. 297; 7 Cr. 336–7; 21 How. 66; 14 How. 584; 2 P. & H. 504; 17 How. 445; 3 Pet. 210; 6 Gratt. 352; 1 High Inj. § 183;

2 Sto. Eq. Jur. § 882; 11 E. L. & E. 182; 13 Id. 245; 2 Sto. Eq. Jur. §§ 877, 864, 875; 1 Tenn. Ch'y 283; 6 Munf. 313; 8 Gill. 433; 1 Sto. Eq. Jur. § 439; 17 Wall. 40.

IV.—*If the court adheres to its opinion, that the fact of forfeiture is res judicata, still the relief prayed for in the bill should be granted, against the forfeiture declared at law, both under the general principles of equity jurisprudence and the provisions of chapter 93 of the Code.*—5 L. R. A. 731; 15 S. E. Rep. 151.

V.—*But if all other relief should be denied, certainly Hukill should receive back the twelve thonsand dollars expended in boring the two oil wells on the leased property.*—2 Sto. Eq. Jur. § 799, a. and n.; 1 Sto. Rep. 478, 494.

W. P. HUBBARD, for appellant.

I.—*The judgment in the unlawful detainer is not res judicata because:*

  1.—Of the nature of that proceeding, which is not to try title or cover right of possession but only the question of possession.—34 W. Va. 61; 26 Pac. Rep. 3; 106 Ill. 189; 120 Ill. 9, 16; 71 Cal. 428; 5 Litt. 185.

  2.—Of the statute.—Code, c. 89, s. 3; 12 Gratt. 567.

  3.—If against Guffey it would not have barred a subsequent suit by him.—30 W. Va. 681.

II.—*If such former judgment be res judicata, equity may relieve against it, because*

  1.—It is a declaration of forfeiture.

  2.—Evidence which is here admissible and controlling was in the former action neither admitted nor admissible—50 N. Y. 187; 35 Vt. 457; Bl. Jdgmts. §§ 614, 618, 726, 733; 48 Tex. 491; 23 Cal. 596, 628; 56 Miss. 652; 2 So. Rep. 633; 1 Mo. 432; 60 N. Y. 272; 24 Neb. 643; 42 Cal. 367; Big. Estop. 43; 13 W. Va. 314; 18 W. Va. 103; 28 W. Va. 715.

III.—*This forfeiture may be relieved against, because compensation may be made.*

  1.—The rental is not a pittance.

  2.—If it were too small the lessor should not have notified the lessee.

  3.—The amount of rental is not material.

IV.—*Relief should be granted because Guffey's lease was obtained by fraudulent representation.*

ALFRED CALDWELL of counsel for appellee:

I.—*The evidence of handwriting of an attesting witness is admissible, when he is out of the jurisdiction of the court.*—1 Whar. Ev. (2d Ed.) § 726; 1 Greenl. Ev. § 572.

II.—*The party, whose evidence is withdrawn from the jury, is entitled to have it most benignly interpreted by the substituted court.* —25 W. Va. 642; 30 W. Va. 34; 8 W. Va. 553.

III.—*The instruments, under which both the parties claim are leases not mere licenses.*—2 Am. Lead. Cas. 549 *et seq.;* 1 Washb. R. Prop. 542; 81 Va. 764; 84 Va. 706; 53 Pa. St. 229; Tay. Land. & Ten. §§ 14, 31; 102 U. S. 64; 107 U. S. 437; 111 U. S. 584.

IV—*The nature of these oil leases.*—101 Pa. St. 452; 57 Pa. St. 83; 107 Pa. St. 57; 3 P. F. Sm. 229; 15 Norr. 307; 340 P. F. Sm. 142; 8 Cas. 241; 88 Pa. St. 198; 55 Pa. St. 164; 72 Pa. St. 173; 77 Pa. St. 221; 123 Pa. St. 491; 112 Pa. St. 443; 110 Pa. St. 312; 4 W. Va. 543.

V.—*Lease, under which appellant claims, was forfeited.*—Pa. Cas. above cited; 21 Hun 26; 86 N. Y. 638; 1 Sm. Lead. Cas. (s. p.) 109 and notes; 2 Seld. 81; 8 Paige 427; 13 W., Va. 12; 47 Mich. 55; 89 N. C. 31; 83 Va. 547; Co. Litt. 218b.; 5 Serg. & R. 385.

VI.—*Unlawful entry and detainer the proper remedy.*—Ad. Eject. 20; 25 Gratt. 789; 25 W. Va. 407; 24 W. Va. 685; 12 Gratt. 473; Code, c. 89; 23 Gratt. 363; Code, c. 134, s. 1; 18 Gratt. 648; 73 Ill. 75; 24 Ill. 278; 3 Hill 33; 5 Serg. & R. 424; 29 Md. 324; 21 N. H. 234; 24 Mo. 13; 50 Mo. 350; Wood Land Ten. § 54; 4 Rand. 468; Id. 476.

VII.—*Evidence tending to show that execution of second lease was not intended as declaration of forfeiture of first was inadmissible.*—11 S. E. Rep. 754; 21 Hun. 26; 86 N. Y. 638; 96 Pa. St. 307; 80 Pa. St. 142; 11 Lom. Dig. (t.p.) 37, 38; 12 Leigh 479; 2 Wash. (Va.) 59; 27 Gratt. 403; 32 Gratt. 604; Cro. Eliz. 884; 13 Gratt. 705; 18 Gratt. 204; Id. 197; 22 Gratt. 764; 2 Leigh. 630; 6 Gratt. 634; 27 Gratt. 646; 28 Gratt. 593; 83 Va. 508; 9 W.

Va. 636 ; 15 W. Va. 576 ; 26 W. Va. 467 ; 7 W. Va. 297;
Id. 289 ; 16 W. Va. 651 ; 19 Pick. 314 ; 9 Cow. 754 ; 5
Gratt. 141 ; 12 S. E. Rep. 522 ; 4 W. Va. 45 ; 6 W. Va.
110 ; 18 Gratt. 801 ; 27 Gratt. 407 ; 16 W. Va. 443 ; 12
W. Va. 246 ; 22 W. Va. 1 ; 22 N. J. Eq. 457 ; 96 U. S.
332 ; 98 U. S. 514 ; 17 Wall. 19 ; 101 U. S. 96 ; 91 U. S.
291 ; 8 W. Va. 573 ; 17 W. Va. 128 ; 27 W. Va. 743 ;
29 Gratt. 31 ; 118 U. S. 73 ; 15 W. Va. 568 ; 2 Sto. Eq.
Juris. § 1324.

VIII.— *Forfeiture of the Hays or Hukill lease is res judi-
cata.*—Hawk. P. C. 140, c. 64, s. 1 ; 13 Hen. Stat. 5 ; 4
Rand. 471 ; 30 W. Va. 35 ; 12 Gratt. 472 ; Bar. L. Pr.
372 ; 82 Va. 97 ; 25 Gratt. 789 ; 21 W. Va. 277 ; 24 W.
Va. 685 ; 14 W. Va. 731 ; 34 W. Va. 49 ; 60 Wis. 133 ;
1 Ida. (N. S.) 349 ; 94 Ill. 214 ; 47 N. Y. 330 ; 97 Ill.
234 ; 32 Ind. 313 ; 44 Mo. 283 ; 27 Wis. 406 ; 43 Ala.
598 ; 33 Ga. 344 ; 34 W. Va. 774.

IX.—*Appellant should receive no allowance for drilling wells.*—
29 W. Va. 258 ; Id. 337 ; 30 W. Va. 784.

HOLT, JUDGE :

This is a suit in equity, brought on the 28th day of
June, 1890, in the Circuit Court of Monongalia county, by
Edwin M. Hukill against J. M. Guffey, Michael Murphy,
Rezin Calvert, David Wise and Joseph Bushnell, praying,
among other things, relief from the forfeiture of what is
called the "Hays Oil Lease," and for an injunction to the
execution of a writ of possession on the judgment rendered
by the Court of Appeals of this State on the 24th of June,
1890, in the case of unlawful detainer of *Guffey* against
*Hukill*, reported in 34 W. Va. 49 (11 S. E. Rep. 754).

Defendants James M. Guffey and Michael Murphy filed
their joint answer.

Plaintiff then filed an amended and supplemental bill,
alleging, among other things, that the writ of possession
had been executed, and again filed his second amended
bill, setting up the forfeiture of what is called the "Cal-
vert Lease," the one under which Guffey and Murphy
recovered the possession in the action of unlawful entry
and detainer.

On February 21, 1891, defendants Guffey and Murphy filed their joint answer to the amended and supplemental bill and the second amended bill, to which plaintiff replied generally. The bill was taken for confessed as to the other defendants, the exhibits were filed, and various depositions taken and filed, to which exceptions were taken. On the 15th day of April, 1891, the cause was finally heard, the injunction dissolved, and plaintiff's bill dismissed; and from this decree plaintiff, Hukill, appealed.

The facts as to which there is no dispute are as follows: What is called the "Mount Morris Oil Field" embraces a part of Monongalia county, W. Va. In this West Virginia part of this oil field David Wise is the owner in fee of the tract of thirty acres in controversy. For this thirty-acre tract and a tract of two acres David Wise executed to William Hays an oil lease, dated 30th June, 1886, which was acknowledged 25th October, 1886, and admitted to record 26th October, 1886. On January 10, 1889, Hays, in consideration of three hundred dollars, assigned this lease to plaintiff, Hukill. This assignment was admitted to record January 22, 1889. A copy of the aforesaid lease reads as follows:

EXHIBIT A. OIL LEASE.

"This lease, made this 30th day of June, A. D. 1886, by and between David Wise, of the county of Monongalia and state of West Virginia, of the first part, and William Hays, of Pennsylvania, of the second part, witnesseth that the said party of the first part, in consideration of the stipulation, rents, and covenants hereinafter contained on the part of the said party of the second part, his executors, administrators, and assigns, to be paid, kept, and performed, hath granted, demised, and let unto the said parties of the second part, their executors, administrators, and assigns, for the sole and only purpose of developing, drilling for and producing of petroleum or carbon oil, and for the laying of pipe, either under or on top of said surface, for transportation of the product of said development, all of that certain tract of land hereinafter described. It is further agreed that, if gas is obtained in sufficient quantities to utilize, the consideration in full to the party of the first

part shall be twenty dollars per annum for each and every well drilled on the premises herein described, so long as the same is utilized, payable * * *. This lease embraces all of that certain tract of land situated in Cass district, Monongalia county, and state of West Virginia, and bounded and described as follows, to wit: On the east by lands of C. C. Wade, on the north by lands of Abraham Snyder, on the west by lands of C. C. Wade, on the south by lands of David Wise, containing two acres, more or less. Also one other piece of land in same district and county, containing thirty acres, more or less. The parties of the second part shall. pay all taxes arising from an increased valuation of the premises by reason of oil operation thereon. To have and to hold said premises, for the said purpose only, unto the said parties of the second part, their executors, administrators, or assigns, for, during, and until the full term of twenty years next ensuing the day and year above written. The said party of the second part hereby covenants, in consideration of the said grant and demise, to deliver unto the said party of the first part, his heirs and assigns, the full equal one eighth (1-8) part of petroleum or carbon oil discovered and produced on the premises herein leased as produced in the crude state, the said second parties to furnish tankage for the same until pipe line is provided. The said party of the first part is to fully use and enjoy the said premises for the purpose of tillage, except such part as shall be necessary for said development purposes, and a right of way over and across the said premises to the place or places of operating. The said party of the first part covenants to grant to the said party of the second part the right to move any machinery or fixtures placed on said premises by said parties of second part. The parties of the second part covenant to commence operations for said purposes within nine months from and after the execution of this lease, or to thereafter pay to the party of the first part one and thirty three and one third dollars per month until work is commenced, the money to be deposited in the hands of John Kennedy for each and every month; and a failure on the part of said second parties to comply with either one or

the other of the foregoing conditions shall work an absolute forfeiture of this lease. In witness whereof we, the said parties of the first and second part, have hereunto set our hands and seals the day and year above written."

"DAVID WISE. [Seal.]

"State of West Virginia, Monongalia county—ss. :

"On this 25th day of October, 1886, before me, a justice of the peace in and for said county, personally appeared the above-named David Wise, and acknowledged the foregoing indenture to be his act and deed, and desired the same to be recorded as such.

"Witness my hand and seal the day and year aforesaid.

"W. P. BARKER, Justice.

"State of West Virginia—ss. :

"Be it remembered that on the 26th day of October, 1886, the foregoing writing was produced to me, Waitman T. Willey, clerk of the County Court of Monongalia county, in my office, and, together with the certificate of acknowledgment thereof, was then and there admitted to record.

"Teste :    WAITMAN T. WILLEY, Clerk."

EXHIBIT B.    ASSIGNMENT.

"Know all men by these presents that I, William Hays, for and in consideration of the sum of three hundred dollars, to me in hand paid by E. M. Hukill, the receipt whereof is hereby acknowledged, have granted, bargained, sold, and assigned, and by these presents do grant, bargain, sell, and assign, unto said E. M. Hukill a certain oil lease, dated June 30, 1886, made by David Wise to me, of two tracts of land—one containing two acres, the other containing thirty acres—situated in Cass district, Monongalia county, West Virginia, recorded in the clerk's office of said county in Book 22, N. S., page 193, October 26, 1886 ; to have and to hold the same to said E. M. Hukill, his executors, administrators, and assigns.

"Witness my hand and seal this 10th day of January, 1889.

"W. D. HAYES. [Seal.]

"In the presence of

"JAMES C. BOYCE.

"State of Pennsylvania, county of Allegheny—to wit:

"I, Henry Wieskettle, a notary public in and for said county, do certify that William Hays, whose name is signed to the writing hereto annexed, bearing date on the tenth day of January, 1889, has this day acknowledged the same before me in my said county.

"Given under my hand and official seal this tenth day of January, 1889.

"HENRY WIESKETTLE.    [Seal.]

"State of West Virginia—ss.:

"Be it remembered that on the 22nd day of January, 1889, the foregoing writing was produced to me, Waitman T. Willey, clerk of the County Court of Monongalia county, in my office, and, together with the certificate of acknowledgment thereof, was then and there admitted to record.

"Teste:    WAITMAN T. WILLEY, Clerk.

"A copy.    Teste:    R. E. FAST, Clerk."

By lease dated 11th of July, 1888, acknowledged 11th of November, 1888, and admitted to record 18th December, 1888, David Wise leased for oil purposes the same thirty acres to Rezin Calvert, called the "Calvert Oil Lease." On the 16th March, 1889, Rezin Calvert assigned this lease to his two daughters, Ida C. Calvert and Vinnie J. Calvert, who, by assignment dated 8th of May, 1889, assigned it for the sum of one thousand five hundred dollars to the defendants J. M. Guffey and M. Murphy. This lease was acknowledged November 1, 1888, and admitted to record 18th December, 1888. It reads as follows:

EXHIBIT C.    LEASE.

"This agreement, made and entered into this 11th day of July, A. D., 1888, by and between David Wise, of Cass district, of the county of Monongalia, and state of West Virginia, of the first part, and Rezin Calvert, of Waynesburg, Green county, Pennsylvania, of the second part, witnesseth that the said party of the first part, for the consideration of the covenants and agreements hereinafter mentioned, has granted, demised, and let unto the party of the second part, his heirs or assigns, for the purpose and with the exclusive right of drilling and operating for petroleum

and gas, all that certain tract of land situated in Cass district, Monongalia county, and state of West Virginia, bounded and described as follows, to wit, north by lands of Asberry Lemley, east by lands of Margaret Inghram, south by lands of D. L. Donley, west by lands of Edgar Wise, containing thirty acres, to be the same more or less, reserving * * * acres around the buildings upon which no well shall be drilled; the party of the second part, his heirs or assigns, to have and to hold the above-described premises for and during the term of twenty years from the date hereof, and as much longer as oil or gas is found in paying quantities thereon. The said party of the second part, in consideration of the said grant and demise, agrees to give to the party of the first part the full, equal one eighth part of all petroleum obtained or produced on the premises herein leased, and to deliver the same in tanks or pipe lines to the credit of the party of the first part. It is further agreed that, if gas is found in paying quantities, the consideration in full to the party of the first part for the gas from each well when marketed is to be one eighth of cash for which the gas brings when marketed. The party of the first part grants the further privilege to the party of the second part of using sufficient water from the premises herein leased necessary to the operation thereon, the right of way over said premises, together with the right to lay pipes to convey oil or gas from this or other property of party of the second part, the right to remove any machinery or fixtures placed on said premises by the party of the second part. The test wells shall be located in the hollows, or at such places as to do no unnecessary damage, and any damage done to the growing crops by the operations of the second party shall be paid for by the party of the second part. Operations on the above-described premises shall be commenced and one well completed within six months from the date hereof, and in case of failure to complete one well within such time the party of the second part agrees to pay to the party of the first part for such delay a yearly rental of fifty cents per acre from the time of completing such well as above specified, payable directly to the party of the first part, and the party of the first part agrees to

accept such sum as full payment for such delay until a well shall be completed; and a failure to complete a well or to make such payment as above mentioned renders this lease null and void and to remain without effect between the parties hereto. The above rental is to be paid every six months. It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to the heirs, executors, and assigns.

"In witness whereof we, the said parties of the first and second parts, hereto set our hands and seals the day and year first above written.

"DAVID WISE.      [Seal.]
"REZIN CALVERT.   [Seal.]

"Witness:   J. R. MILLIKEN."

"State of Pennsylvania, Green county—ss.:

"On the 1st day of November, 1888, before me, one of the justices of peace in and for said county, personally appeared the said David Wise above named, and acknowledged that he did sign and seal the foregoing instrument, and that it is * * * own free act and deed, for the uses and purposes herein named, and desired the same to be recorded as such.

"J. R. MILLIKEN, Justice of the Peace."

"State of West Virginia—ss.:

"Be it remembered that on the 18th day of December, 1888, the foregoing writing was produced to me, Waitman T. Willey, clerk of the County Court of Monongalia county, in my office, and together with the certificates of acknowledgment thereof, was then and there admitted to record.

"Teste:   W. T. WILLEY, Clerk."

"For value received I assign the within lease to Ida C. Calvert and Vinnie J. Calvert, this sixteenth day of March, 1889.

"Witness my hand and seal.

"REZIN CALVERT.   [L. S.]

"Witness:   D. L. DONLEY."

"Know all men that we, Ida C. Calvert and Vinnie J. Calvert, of Greene county, Pennsylvania, do assign and transfer and set over the within lease unto J. E. Guffey, of

Pittsburgh, Pennsylvania, and M. Murphy, of Philadelphia, Pennsylvania, for value received, with all rights, interests, powers, and possessions conveyed to us; to have and to hold to my assignees aforesaid, and to their legal successors in said property and rights, and to their assigns forever.

"Witness our hands and seals this 8th day of May, 1889.

"IDA C. CALVERT.      [Seal.]
"VINNIE J. CALVERT.   [Seal.]

"Attest:   J. H. WISE.

"State of Pennsylvania, Greene county, Pa.:

"On this 8th day of May, 1889, before me, a notary public of said county, came Ida C. Calvert and Vinnie J. Calvert, and acknowledged the foregoing indenture to be their act and deed, and desiring the same to be recorded as such.

"Witness my hand and notarial seal.

"J. H. WISE."

No rentals were paid to Wise on the Hays lease until a short time before January 10, 1889—date of assignment from Hays to Hukill—when all the rentals due were paid to David Wise. No work was done on the lease until about the 1st of May, 1889, or later in that month, when Hukill commenced boring for oil, and worked continuously, boring two wells; one spoiled in the boring, and the other striking oil in large and paying quantities on 25th November, 1889. On the 15th July, 1889, Hukill was notified by Guffey and Murphy, in writing, of their claim, which notice is as follows:

"NOTICE.

"July 5th, 1889.

"E. M. Hukill, Esq.

"Dear Sir:

"We are informed that you are drilling upon the thirty-acre tract of David Wise, in Cass district, Monongalia county, West Virginia. This is to notify you that we have a lease of said premises, giving us the sole right to drill on said premises, and that, if you proceed with your operations, you do so at your own risk and peril. The lease owned by us was recorded in Book twenty five, page

one, of December eighteenth, eighteen hundred and eighty eight.·

"J. M. GUFFEY and MICHAEL MURPHY."

On the 23d January, 1890, Guffey and Murphy brought against Hukill an action of unlawful detainer for the recovery of the possession of the thirty acres, according to the terms of their Calvert lease; and on demurrer to the evidence the Circuit Court of Monongalia county gave judgment in favor of the plaintiffs Guffey and Murphy. Hukill took it to the Supreme Court of Appeals, where, on June 24, 1890, the judgment of the Circuit Court was affirmed. See *Guffey* v. *Hukill*, 34 W. Va. 49 (11 S. E. Rep. 754).

On the 26th day of June, 1890, a writ of possession was issued, and on the same day executed by placing P. A. Troutman, the agent appointed by Guffey and Murphy for the purpose, in the possession of the premises.

The pleadings are as follows: Plaintiff alleges in his bill the foregoing facts, and, in addition thereto, as follows: that he is the pioneer oil operator in Monongalia county; has been in the business twenty five years, and for over·five years in the "Mt. Morris oil field"—the one in question; took many leases·in this field, intending to develop the territory; and produced the first oil in quantity in that field, which was about October, 1886; that the Hays lease of the thirty acres was given by Wise to Hays on June 30, 1886, providing that the lessee should commence operations in nine months from its date or pay one dollar and thirty three and one third cents per month until work was commenced, and that "failure to comply with either one or the other of such conditions shall work an absolute forfeiture of this lease;" that the Hays lease was acknowledged October 25, 1886, and recorded October 26, 1886, and on January 10, 1889, was duly assigned for value three hundred dollars by Hays to plaintiff, Hukill, and assignment acknowledged and recorded January 22, 1889; and that all rentals had been paid and accepted in full by Wise before the assignment.

About May 1, 1889, plaintiff, without any knowledge that any one else claimed any right in the premises, entered into actual possession of the premises under the terms

of the lease, and got out rig timber, and commenced to sink a well. November 25, 1889, he struck a good well, yielding oil in large quantities; sank a second well, which produced oil in paying quantities; had no intimation that any one else claimed any interest in the premises until about July 5th, when J. M. Guffey and Michael Murphy notified him that they claimed the premises under a second and junior lease for the same premises from David Wise.

He had been in the open, notorious possession of the premises, expending large sums of money therein in boring for oil, before he received the notice. Guffey and Murphy brought no suit against him, and gave him no further notice of any claim of theirs to the premises until after plaintiff had completed one of his wells, when, on 23d January, 1890, they brought an action of unlawful detainer against him, claiming the right to the possession of the premises under lease to Calvert, assigned as already mentioned; and that they never had any interest whatever in the second lease until after plaintiff was in the open, notorious possession of the premises, operating thereon for oil, and after all the rentals had been paid to David Wise on the first lease, and had been accepted by him of plaintiff, and after Wise, as he had a legal right to do, had waived any forfeiture of said first lease for the non payment of rent; and plaintiff, in good faith believing and being advised that his lease was in full force and effect, spent his money in large amounts for the development of the property for oil.

The unlawful detainer case was tried as aforesaid, a demurrer to evidence by plaintiffs resulting in judgment for them against defendant here for the possession of the Wise thirty acres, which judgment was affirmed on appeal on 26th June, 1890, which held and decided that plaintiff's elder lease was forfeited by the execution of the second lease. It was not the intent of David Wise to declare said lease forfeited by the execution of the second lease to Rezin Calvert, who pursued Wise for some time, trying to prevail on him to execute the second lease, and only succeeded by false and fraudulent means in procuring said lease from Wise.

At the time the second lease was executed, and before

·David Wise would execute the same, and as an inducement to Wise to execute the same, the said Rezin Calvert then and there agreed that if Wise would execute the lease to him, he, Calvert, would take the lease subject to the ·Hays lease (under which plaintiff claims) and that, if Hays claimed under his lease, or Hays's assignee so claimed, he, Calvert, would return to him, Wise, the second lease. Calvert never entered into the possession· of the premises, never bored for oil, did not within six months commence operations therein, did not pay one dollar of rental. No money was ever tendered as rental to Wise by either Rezin Calvert, Ida C. Calvert, or Vinnie J. Calvert. No money was ever tendered under said lease as rental until 1st July, 1889 —nearly one year after said second lease was executed, and about two months after plaintiff, under his lease, had been in possession of the premises and drilling for oil thereon. The first tender was on the 1st July—too soon to be a legal tender ; the next on 11th July—one day too late to constitute a legal tender. Wise refused to receive these so-called "tenders," and by divers unequivocal acts recognized plaintiff as his lawful lessee, and constantly refused to recognize the said Guffey and Murphy as his tenants.

Plaintiff says Wise was his friend, in entire sympathy with him; that defendants Guffey and Murphy stood by and saw him spending his money; and when he was successful, and had made the property valuable, then, contrary to equity, they, in their proceedings at law, obtained a judgment to deprive him of the property his hard labor and money expended had made valuable; that Guffey and Murphy took the assignment of the junior Calvert lease with full knowledge of plaintiff's lease, paying one thousand five hundred dollars therefor, on May 8, 1889 ; and plaintiff offers and tenders to them the said sum, with interest from May 8, 1889. Plaintiff expended, in putting down the two wells, on said lease, etc., about twelve thousand dollars, which, in any event, ought to be repaid to him. Plaintiff has on the land certain personal property, naming it, which he claims the right to take away in any event. He makes Guffey, Murphy, Calvert, David Wise, and Joseph Bushnell parties defendant ; prays relief from said forfeiture ; if that

can not be allowed him, then that he be allowed costs and expenses in putting down the wells, and be permitted to remove his personal property ; for an injunction to execution of writ of possession, and for general relief.

The bill was taken for confessed as to all the defendants except Guffey and Murphy, who filed their joint answer, alleging that no rent was paid, or possession taken, nor work done under the Hays lease within the time fixed by the lease ; and that Hays, and plaintiff claiming under him, had wholly and utterly failed in every respect to comply with the provisions of said lease, and by reason thereof the same had become and was forfeited for such noncompliance before and at the time the said contract of lease and sale was so executed and delivered to Calvert ; and that plaintiff was not a *bona fide* and innocent purchaser when he took from Hays the assignment of his lease, but, on the contrary, had full knowledge and notice of the defendants' said Calvert lease ; had full knowledge and notice thereof when he entered and operated said premises, and did the same with the intent and purpose to hinder and defraud defendants of their rights in the premises.

Defendants further allege that all questions sought to be raised in this proceeding, and all the rights of plaintiff and defendants under the leases under which they respectively claim the said leased premises, were fully and finally settled and adjudicated in the said action at law, before referred to ; the court then holding that the lease under which defendants claim was valid and binding, and that they were entitled to the property in controversy, while the lease under which the plaintiff claims was invalid and void as to defendants, and that plaintiff was not entitled to the said premises ; and defendants claim by their answer the benefit of the said adjudication, as fully as if it had been formally pleaded.

Defendants further say that in the trial of said action at law the court had the unquestioned jurisdiction and right to determine and adjudge the question of forfeiture and validity of the lease under which plaintiff claims, and held the same to be forfeited ; that plaintiff did not enter upon the premises, and operate therein, in good faith, but, on

the contrary, was a deliberate and willful trespasser on defendants' rights, and consequently entitled to no relief or consideration whatever in a court of equity; and, having answered, pray to be dismissed with their costs.

Plaintiff then filed an amended supplemental bill in regard to the execution of the right of possession and the personal property on the premises. Plaintiff then filed a second amended bill, alleging that the Calvert lease is forfeited; that the money should have been tendered or paid on July 10th and January 10th, whereas it was tendered July 1st (nine days too soon) and July 11th (one day too late); that second tender was made on January 10th, and again prays relief from the forfeiture.

Defendants Guffey and Murphy filed a joint answer to these amended bills, referring to their original answer, which they refer to as a part of this. They deny having any of plaintiff's personal property, and that, if they have, his remedy at law is plain and adequate; and that they were not required to make any further or other tender to Wise after he had arrayed himself in hostility against them; and, having answered, pray to be dismissed, *etc.* General replications were filed, depositions taken, and final decree dismissing plaintiff's bill, already mentioned.

This case involves two questions: (1) The forfeiture of leases in general, especially the forfeiture of mineral leases on royalty, and in this instance that particular kind of mineral lease called an "oil lease." (2) Conceding the forfeiture of such oil lease, in what cases, and when, and how may the tenant be relieved from the forfeiture and reinstated in his place as lessee?

The counsel on the respective sides have discussed these two main questions and some minor ones falling under the same heads with marked ability and breadth of research. There is a chapter in our Code on this subject—chapter 93, Code (1891)—which must be looked to. Section 16 reads as follows:

"Any person who shall have the right of re-entry into the lands by reason of any rent issuing thereout being in arrear, or by reason of the breach of any covenant or condition, may serve a declaration in ejectment on the ten-

ant in possession ; where there shall be such tenant, or, if the possession be vacant, by affixing the declaration upon the chief door of any messuage, or at any other conspicuous place on the premises, which service shall be in lieu of a demand and re-entry; and upon proof to the court by affidavit in case of judgment by default, or upon proof on the trial, that the rent claimed was due, and no sufficient distress was upon the premises, or that the covenant or condition was broken before the service of the declaration, and that the plaintiff had power thereupon to re-enter, he shall recover judgment, and have execution for such lands."

Section 17 : "Should the defendant, or other person for him, not pay the rent in arrear, with interest and costs, nor file a bill in equity for relief against such forfeiture, within twelve months after execution executed, he shall be barred of all right in law or equity to be restored to such lands or tenements."

Section 20 : "If the person claiming the land shall, upon bill filed as aforesaid, be relieved in equity, he shall hold the land as before the proceedings began, without a new lease or conveyance."

Section 21 : "In case the time for re-entering be specified in the instrument creating the rent, covenant or condition, the proceedings in ejectment shall not be begun until such time shall have elapsed."

Section 22 : "When actual re-entry shall be made, the party by or for whom the same shall be made shall return a written act of re-entry, sworn to by the sheriff or other officer acting therein, to the clerk of the County Court of the county wherein the lands or tenements shall be, who shall record the same in the deed book, and publish the same, * * * *. Such written act of re-entry, when recorded, and the record thereof, or a duly-certified copy from such record, shall be evidence in all cases of the facts therein set forth."

Section 24 : "Should the person entitled to such land at the time of re-entry made, or having claim thereto, not pay or tender the rent, and all arrears thereof, with interest, and all reasonable expenses incurred about such re-entry, within one year from the first day of publication as afore-

said, he shall be forever barred from all right in law or equity to the said lands. In case any party having right shall pay or tender the said rent and arrears, with interest and expenses, as aforesaid, to the party making re-entry within the time aforementioned therefor, he shall be reinstated in his possession, to hold as if no re-entry had been made."

All the foregoing sections of this chapter were taken from 2 Rev. St. N. Y. p. 505, art. 2, §§ 30-38, as that law was in 1849, but is extended so as to cover other cases than the recovery of the demised premises for nonpayment of rent. This remedy by ejectment has been very sparingly used in this State, as far as my own observation extends. These provisions were not reported by the revisors of the Code of 1849, but were added for the first time in the legislature. In a note to section 6 the revisors say: "Though this section is based upon the statutes cited in the margin (2 Geo. II. c. 19, §§ 16, 17,) we have so far modified them as to dispense with the agency of a justice of the peace. Should any unlawful entry be made under this section (relating to premises deserted by the tenant, or left uncultivated or unoccupied) the party turned out of possession may proceed under chapter 134, being now chapter 89 in Code of West Virginia, giving the summary remedy for unlawful entry or detainer in the Circuit Court "

In *Bowyer* v. *Seymour*, 13 W. Va. 12, (1878) Judge HAYMOND discusses the whole subject with ability and at length. It was there held : "4. But, if the landlord in such case, instead of availing himself of the action of ejectment under the sixteenth section of said chapter 93, brings an action of unlawful detainer, he can not sustain such action, if at all, unless he prove not only a demand for the rent due at the time, place, and in the manner prescribed by the common law in such case, but must also, where a re-entry can be made on the leased premises, or any part thereof, prove such re-entry, or its equivalent, before the commencement of his action."

There is, from some cause, an evident reluctance against using ejectment in such cases.

The case out of which this one has arisen was an action

of unlawful detainer, as already stated, brought in the Circuit Court of Monongalia county on January 23, 1890, by Guffey against Hukill for the possession of the thirty acres here in controversy. Hukill claimed under the lease from Wise to Hays, dated June 30, 1886. The lessee was to commence operations for boring for oil within nine months from that date—that is, before April 1, 1887—or thereafter pay Wise, the lessor, one dollar and thirty three and one third cents per month until work was commenced for each and every month, and a failure on the part of the lessee to do one or the other was to work an absolute forfeiture of the lease.

It was an oil-lease, in which the lessor was to have a royalty of one eighth part of the oil discovered and produced. The lessee failed to begin the work of boring within the nine months, and failed to pay any of the monthly rent. On the 11th July, 1888, Wise, the owner of the land, gave another oil-lease of the thirty acres; this time to Calvert, from whom it came by assignment to these defendants, Guffey and Murphy. Both leases were on record.

Early in May, 1889, Hukill, under the first lease, entered into possession with full consent of Wise, the owner, who had possession of the surface, and commenced to sink a well. On 15th July, 1889, Guffey and Murphy notified Hukill that they had a lease (of 11th July, 1888) of the premises, giving them the sole right to drill on the premises (thirty acres) and that, if Hukill proceeded with his operations, he did so at his own risk and peril, and referred him to where their lease was recorded. Hukill bored on, and on 25th November, 1889, he struck a good well, yielding oil in large quantities.

On the 23d January, 1890, Guffey and Murphy brought against Hukill their action of unlawful detainer. It was tried February, 1890, with judgment for plaintiffs; was appealed by Hukill; and this Court, on June 24, 1890, affirmed the judgment of the court below.

I have given this statement to show that the fact of the forfeiture of the Hukill (Hays) lease is *res judicata*. I do not see how there can be two opinions on this question, for

the Court expressly say, and the point was directly involved, "the execution of the second lease is a sufficient declaration of the forfeiture without demand and re-entry." *Guffey* v. *Hukill*, 34 W. Va. 49 (11 S. E. Rep. 754). Wise, the lessor, was, under the terms of the lease, and in fact, the only one in visible, actual possession of the thirty acres when the forfeiture of the Hukill lease took place ; and the court regarded the second lease, under such circumstances, as "an unequivocal declaration of forfeiture of the first lease."

But it is contended that there was no forfeiture of the lease under which plaintiff, Hukill, claims, because the conclusion reached by this Court in *Guffey* v. *Hukill, supra,* was in an action of unlawful detainer, the verdict in which does not bar a future action, especially as that was at law and this is in equity. We must however remember that it is the strict rule of the common-law, creating the harsh result of forfeiture, which calls into play the interposition of a court of equity in granting relief against it in certain cases. The bill in equity for relief against it presupposes a forfeiture at law.

What bearing on this question of the forfeiture has section 4, c. 89, Code? Section 4 reads as follows : "No such judgment (in the action of unlawful entry or detainer) shall bar any action of trespass or ejectment between the same parties, nor shall any such verdict be conclusive in any future action of the facts therein found."

The action of unlawful entry and detainer now bears in some degree the same relation to the action of ejectment, now final, which the act of ejectment, before 1st July, 1850, then not final, bore to the writ of right, which was then abolished. English-speaking people have it ingrained into them that they ought not to be required to lose or give up their land without having, if they see fit, two trials ; hence the action of unlawful entry, when not barred (three years) is frequently used as a preliminary skirmish to feel the enemy, before the final battle is brought on by an action of ejectment.

But trespass is seldom used in this State for the mere purpose of trying titles. In this connection we are referred

to *Olinger* v. *Shepherd,* 12 Gratt. 462, where Judge MONCURE delivering the opinion takes occasion to say : "The judgment has only the effect of placing the parties *in statu quo.* It settles nothing, even between them, in regard to the title or right of possession," (page 473) which is strictly true in many cases, and was true in that case. There the party suing was, in one sense, forcibly turned out, if not with a strong hand, and with a multitude of people ; and he had the right to have the possession restored, no matter what right or title he had thereto ; the right to be placed *statu quo,* to occupy the position of defendant in an action of ejectment, and not to be put at the disadvantage of being plaintiff.

Still the rule holds good in this action, as well as in others, that what, within the meaning of the maxim, has in contested cases once passed into a thing adjudged, can not be again brought into question between the same parties; and this comprehends all necessary inferences, the *sine qua nons,* as well as the very matter in issue ; and turning to *Guffey* v. *Hukill,* 34 W. Va. 49 (11 S. E. Rep. 754) we see how and why this must be so in this instance as to the question of forfeiture.

Hukill, the plaintiff here, was in possession under Wise, and claiming under the elder lease. Guffey, the defendant here, plaintiff there, claimed the right of possession under his junior lease, and the forfeiture of the first lease was a *sine qua non* to the validity of his younger lease, and, by consequence, to his right of possession. The court gave Guffey the possession, holding the first lease forfeited, by its own terms, by noncompliance with either of the two conditions—not boring within the time fixed, or not, in lieu thereof, paying the monthly commutation money ; that the execution of the second lease was an unequivocal declaration by Wise of such forfeiture ; and that in oil-leases of this kind such declaration of forfeiture was sufficient, without demand or re-entry.

The question involved in *Guffey* v. *Hukill* was between two tenants of the same landlord, and the point necessarily and actually litigated and adjudged was that the first lease had become forfeited, and the second lease was good, and that the junior lessee had a right to the possession under his

lease as against the senior lessee, and that the junior lessee could enforce the forfeiture and the right of re-entry as well by the action of unlawful detainer under chapter 89 of the Code as by action of ejectment under section 16 of chapter 93. The proceeding in ejectment would have been conclusive of such forfeiture, and for the same reason the judgment must be so in the action of unlawful detainer. At any rate, it is so in this suit in equity, which is neither within the letter nor the reason of the exception made in the statute. The fact of forfeiture, therefore, is between these selfsame parties necessarily *res judicata*, and can not be again brought in question between them without attacking the judgment itself, which is not attempted. There must be an end of litigation, and this question is closed, not to be again opened between the same parties in any suit of any kind which does not impeach the judgment itself for fraud.

We are urged to review some of the doctrine laid down in *Guffey* v. *Hukill* supposed to be antagonistic to the doctrine of *Bowyer* v. *Seymour*, 13 W. Va. 12, but no one can tell us why, in this case, we should enter upon any such examination. For the reason already given, it could not be otherwise than *obiter*, because beyond the pale of anything here involved; this case being, on the point of forfeiture, ruled by that case as a thing passed into final judgment. The court there held, and it is of necessity embraced within the judgment there rendered: "That the payment of the rent or commutation money to Wise, and his consent to Hukill's taking possession under the Hayes lease, could have no effect to waive the forfeiture, because such payment and taking possession occurred after the execution by Wise to Calvert of the second lease, which operated as a declaration of forfeiture, and to divest all estate under the Hays lease, and invest it in Calvert, and the afteract of payment did not destroy Calvert's rights."

We pass on to that part of the case in this view still open. Here the arguments of learned counsel, and the breadth of their research upon this subject, reaching from old fashioned farming leases down to a modern oil-lease, have put it in our power to give this point a fuller exami-

nation on authority than it could otherwise receive. And my conviction is clear and decided that in this particular case the damages from forfeiture can not be compensated; not intending by this, however, to mean these cases as a class, but this particular case, the only one before us.

The Hukill lease was given to Hays by Wise, June 30, 1886, of his small tract of thirty acres—a mere dot in the center of the Mt. Morris oil field; leasing and talking about boring and preparations for boring going on all around him. How easily could his little spot be held in reserve at one dollar and thirty three and one third cents per month until drained dry. The boring was to commence inside of nine months; that was the dominating motive with Wise, the lessor; knowing that with a good well brought in his royalty (one eighth) would bring him sixteen dollars a day, instead of sixteen dollars a year. And this commutation money was clearly thought to be by him, if not so intended by the other, only a temporary substitution, to tide over short or accidental delay. If we do not give it this construction, but hold that this small sum, though not substantial, must be adhered to, because it is so stated in the lease, we forget that the lease is now forfeited at law; that Wise's second lessees now have the upper hand of their adversary in this controversy; and it ill becomes a suppliant for a species of mercy in a court of equity to base his prayer for relief upon the enforcement of a *quasi* penalty. No court of equity would hear to it.

The one great thing to be done was the specific act of boring; its breach clearly noncompensable with so small a sum as the commutation money. I take the rule to be settled by a multitude of authorities that before a court of conscience will relieve against a forfeiture of such a lease there must be a fair and reasonable commutation as alternative for the main thing to be done, or the damages from failure to do such main thing must be measurable in money with some reasonable degree of certainty, or there must be some special circumstances calling for relief from the 'forfeiture caused by the party's failure to perform the specific act which he covenanted to perform.

The special circumstances relied on I here give most favorably in David Wise's own words:

"I believe on July 11, 1888 (date of second lease) I executed a lease on said thirty-acre tract to Rezin Calvert. Well, sir, Calvert teased me every time he saw me, for over three weeks, and then at the end of his teasing he said if this other Hays lease comes on he would give his up; that is, whichever come on first to go to work he was to hold. We told Calvert different times that there was a lease on it, and it was by reason of Calvert's promises to me that if Hays, or his assignee, Hukill (Hukill was not then the assignee) claimed the benefit of his lease, and complied with its conditions, that he, Calvert, would return to me his lease. That caused me to execute the lease to him, said Calvert."

If Wise had had that, or the like of it, put on the back of this junior lease, the junior could not have been an unequivocal declaration on his part of the forfeiture of the senior lease. What its effect may be in that regard, as it is, by mere word of mouth, viewed as to the point of competent or incompetent evidence, brings us near the danger line of trenching upon written evidence with evidence merely verbal, and as to instruments disposing of property real, especially such as are intended to be unchangeable and imperishable muniments of title to estates, putting them at great hazard.

Still we know that there are classes of cases of common occurrence in which the general rule which excludes such evidence as tending to contradict or vary a written instrument does not forbid an inquiry into the object of the parties in delivering and receiving it. I still think such evidence competent, not for the purpose or with the effect of adding to or taking away from, or in any way directly qualifying the language of the lease itself, or to change or impair its direct legal effect, but only to rebut the drawing of the collateral inference of unequivocal purpose to declare thereby a forfeiture of the former lease. But here we need not take time to discuss this question, because it only bears upon the question of forfeiture; and that, as we have already seen, has passed from the uncertainties of litigation into a thing adjudged.

But, having asked for special circumstances to take the

case out of the general rule of not relieving against forfeiture where the damages are not compensable, will this verbal, contemporary defeasance answer the purpose? The first thing that strikes us, apart from the fact of being by mere word of mouth, is that the verbal condition fastened on to the junior lease is not precedent, to give it character from the start, or a *sine qua non* of its making a start in efficiency, but a condition subsequent; something to cut short and divest an estate or interest already created and running on. Besides, this was also considered in the case of unlawful detainer as to its bearing upon the question whether the second lease was an unequivocal declaration of forfeiture of the first lease ; that, too, presented in its strongest form, as the most favorable answer that could be given to the question on the subject propounded in the trial-court, overruled and exception taken, decided on demurrer to evidence.

So that plaintiff's case, whatever strength it may have had in the beginning has come out of the first contest shorn of all its strength, save the right in equity to be relieved against the forfeiture by showing that the damages incurred by nonperformance of the covenant to bore for oil within nine months is susceptible of pecuniary measurement, so that it may not be unknown what the measure of damages shall be ; and that he can not base his claim to relief from forfeiture by asking in a court of conscience that it may be done by the enforcement of the *quasi* penalty of making the lessor take the unsubstantial alternative commutation money because it is so contracted for in the forfeited lease which he wishes to restore to life on equitable grounds.

UPON REARGUMENT.

(December 22, 1892.)

Holt, Judge :

The action of "unlawful entry or detainer," as it is now called in our statute, is the oldest action for the recovery of possession of land that remains to us. In the time of Bracton (1263) "a person diseised might recover seisin by force with a multitude of friends to assist him, provided he

made this attempt *flagrante disseisine.*" But the state of
things in a hundred years was so altered, and the ideas of
men were so different, that these forcible vindications of a
man's property were thought imcompatible with a well-
ordered government. It was accordingly enacted by stat-
ute—5 Rich. III. c. 7 (1382)—that none from thenceforth
make entry into any lands and tenements but in cases
where entry is given by the law, and in such not with
strong hand, nor with multitude of people, but only in
peaceable and easy manner; and by statute of 15 Rich. II.
c. 2, upon complaint made to any justice of the peace of
such forcible entry, he was to take sufficient power of the
county, go to the place, try the fact, restore the disseisee,
imprison the disseisor, *etc.* See 3 Reeves, Hist. Eng. Law,
392.

By statute—8 Hen. VI. c. 9 (1422)—this summary pro-
ceeding in case of forcible entries was enlarged, and ren-
dered more effectual, including a detainer by force as well
as forcible entry.

The act of February 12, 1814 (1 Rev. Code 1819, pp. 455,
459, § 1) follows the language of the statute of 5 Rich.
above, adding: "(1) And that none who shall have entered
in a peaceable manner shall hold the same afterwards
against the consent of the party entitled to the possession
thereof." It then proceeds to provide in great detail and
fullness the remedy; the form of complaint; the form of
warrant issued by the justice; the form of oath for the
jury, embracing the charge, what they shall find; and the
form of verdict, showing the facts that are to be therein
found. The period of three years has been the bar to such
suit for more than five hundred years, and remains the bar
in our present statute.

In case of forcible or unlawful entry the jury were
required to find that the defendant did (or did not) within
three years, *etc.*, forcibly (or unlawfully) enter upon the ten-
ement, and that the defendant did or did not continue to hold
the possession thereof. In the case of unlawful detainer
the jury were to find that defendant did or did not hold
possession of the tenement against the consent of the
plaintiff for three years next before, *etc.*, and that plaintiff

hath or hath not a right of possession in the tenement aforesaid. Sections 12–15, p. 458, 1 Rev. Code 1819.

Section 18 provides: "No judgment rendered as aforesaid either for the plaintiff or defendant shall bar any action of trespass or any writ of ejectment or writ of right between the same parties respecting the same tenement, nor shall any verdict found as aforesaid be held conclusive of the facts therein found in any action of trespass, ejectment, or writ of right."

In the revision of 1849 the chapter on this subject was reduced to its present form. See Code 1849 (Ed. 1860) p. 608, c. 134; Code W. Va. (Ed. 1891) p. 698, c. 89.

In a note to the revision of 1849 the revisors say, among other things: "The section as we have drawn it, gets rid of long, tedious, and minute forms of complaint, which serve no purpose but to raise questions of form, which embarrass, rather than facilitate, the determination of the right, while they occupy a good deal of unnecessary space." Revisors' Report, 1849, p. 690.

At that time the action of ejectment was not the final action for the recovery of land, but the writ of right was; hence the provision in the act of 1814 that no judgment rendered as aforesaid for the plaintiff or defendant shall bar any action of trespass or any writ of ejectment or writ of right between the same parties respecting the same tenement, nor shall any verdict found as aforesaid be held conclusive of the facts therein found in any such action of trespass, ejectment or writ of right.

Now, the writ of right having been abolished, and the action of ejectment being the final action wherein the judgment is conclusive as to the right of the possession established in such action, section 4 of chapter 89 of the Code has been modified so as to meet such change; hence it reads: "No such judgment shall bar any action of trespass or ejectment between the same parties, nor shall any such verdict be conclusive in any such future action of the facts therein found." The verdict is that the defendant does or does not unlawfully withhold from the plaintiff the premises in question, and the judgment is rendered according to the verdict.

So that, under our present law, the action of unlawful entry and detainer, as prescribed by chapter 89 of present Code, holds in this respect, as to finality of judgment, somewhat the same relation to the present action as ejectment prescribed by chapter 90 of Rev. Code of 1819 held to the writ of right.

Prior to the Code of 1849 "the whole effect of a judgment for the plaintiff in ejectment was to put the lessor of the plaintiff into possession of the land; and the only point decided is that he has a better title to the possession than the defendant." *Chapman* v. *Armistead* 4 Munf. 382–397.

It is a recovery of the possession, not of the seisin or freehold, without prejudice to the right as it may afterwards appear, even between the same parties. He who enters under it in truth and substance can only be possessed according to his right. If he has a freehold, he is in as a freeholder. If he has a chattel interest, he is in as a termor. If he has no title, he is in as a trespasser. If he has no right to the possession, then he takes only a naked possession. See *Taylor* v. *Horde*, 1 Burrows, 60, 113, 114; *Jackson* v. *Dieffendorf*, 3 Johns. 270; *Miles* v. *Caldwell*, 2 Wall. 35.

In unlawful entry and detainer, "the entry of the owner is unlawful if forcible, and the entry of any other person is unlawful (upon an actual possession of the plaintiff) whether forcible or not." *Olinger* v. *Shepherd*, 12 Gratt. 462, 471.

The action of ejectment under chapter 93 of Code (see section 16, p. 709) is also a remedy for any one who has a right of re-entry into lands by reason of the breach of any contract or condition, wherein he shall recover judgment and have execution for such land. Section 17: "Should the defendant, or other person for him, not pay the rent in arrear, with interest and cost, nor file a bill in equity for relief against such forfeiture, within twelve months after execution executed, he shall be barred of all right in law or equity to be restored to such lands or tenements." In this proceeding the judgment of forfeiture is conclusive.

In this case of unlawful entry and detainer, when before this Court in 1890, see *Guffey* v. *Hukill*, 34 W. Va. 49 (11 S.

E. Rep. 754) it was held : "Where a lease for years contains a clause of forfeiture for breach of a covenant to pay a rent or other covenant, but no clause of re-entry for such forfeiture, demand and re-entry is not the only mode by which the landlord may enforce the forfeiture; that the execution of the second lease was a sufficient declaration of the forfeiture, and that the second lessee could maintain unlawful detainer as against the first lessee in possession. On this point BRANNON, J., says :

"The contention that chapter 93, Code 1887, provides the only means of enforcing a forfeiture for nonpayment of rent or breach of condition is not tenable, in my opinion. I think the action of ejectment therein provided is remedial, and a cumulative remedy to dispense with demand and re-entry, and that it does not destroy the common-law mode of demand and re-entry. But, however that may be, it applies only where there is necessity to make demand and re-entry ; and in this case, for reasons above given, there was no duty on the lessor to re-enter. I think the action of unlawful entry lies. It is true it is designed to protect the actual possession. It applies when a tenant holds over after his right has expired. After a declaration of forfeiture by Wise he could have maintained such an action against Hukill, because he would have held after his right expired ; and, he having let to Calvert the right of possession for oil purposes, I do not see why the action does not lie for the plaintiff."

So this Court held that, by reason of the breach of the condition in the Hays lease to bore for oil within nine months or pay the specified sum of one dollar and thirty three and one third cents per month, the lease from Wise to Hays was by its terms forfeited ; that the lease then made to Calvert was a sufficient and effectual declaration of such forfeiture, and that such forfeiture could be enforced and possession recovered as well by an action of unlawful entry or detainer, under chapter 89 of the Code, as by an action of ejectment, under chapter 93, § 16. The proceeding by ejectment would be *res judicata,* conclusive of the forfeiture of the Hays lease.

But it is contended that the action of unlawful detainer

is not conclusive of the forfeiture of the Hays lease, but that such question is still open, unsettled, and at large in this chancery suit, brought among other things, under section 17 of chapter 93, to be relieved from such forfeiture. In the case of *Guffey* v. *Hukill,* 34 W. Va. 49 (11 S. E. Rep. 754) the question of the forfeiture of the Hays (the first) lease and the question of the execution of the Calvert (the second) lease being a sufficient declaration of such forfeiture, and *ipso facto* working the avoidance of such Hays lease, was a matter of fact involved, and was necessarily as well as expressly litigated and determined; and the question is, is such judgment in the case of unlawful entry and detainer final and binding as to such questions actually and necessarily litigated and determined? Such is the opinion of Mr. Black in his work on Judgments. See 2 Black, Judgm. § 663, and authorities cited. I concur in this view, but do not think that in this state it is *res judicata* solely upon the ground given by him. A few illustrations taken from a class of cases common enough in practice to be well known and well settled will show the grounds on which I rest my opinion on that point.

A party has from the commonwealth the oldest patent, and *prima facie* the better title ; such title as gives him the legal seisin—a constructive possession. Another, with a junior grant, enters into actual possession. The senior patentee, within the three years prescribed as the bar, brings his suit of unlawful entry and detainer. Each shows his patent, and these respective titles are inquired into. There is no other material question involved, for by that it is determined who had the legal seisin—the constructive possession ; for this action in this State is designed and used as much to protect the legal seisin and consequent constructive possesion against unlawful invasion, and in such cases to afford summary redress and restitution, as it is to protect the actual possession. Here the legal seisin, the constructive possession, the right of possession when defendant entered, is directly involved, and is actually and necessarily litigated and determined. Yet it is not a binding and conclusive determination of such question between the parties, because the defendant who has been turned out may imme-

diately bring his action of ejectment, or, as the law was before July 1, 1850, his writ of right, against the senior patentee; and the judgment in the action of unlawful entry and detainer is not binding on the parties to ·the question in any respect, no matter how plainly involved and expressly litigated and determined.

But, as matter of fact, it gives him two very decided advantages : (1) That of being defendant instead of plaintiff in the action of ejectment or the writ of right; and (2) it remits him to the possession as of right, gives him the seisin, is *prima facie* evidence that he is seised of the freehold, but is not conclusive of anything except the bare fact of the possession—that possession has been recovered; not even of the right of possession at that particular time, unless it should arise in the second action of unlawful entry and detainer, brought by defendant in the first action as plaintiff in the second action against him as now defendant.

Let us take case No. 2.   The senior patentee, instead of resorting to his action of unlawful entry against the junior patentee, who has invaded and broken up his constructive seisin and possession, takes the law into his own hands, and does as he might have lawfully done in the time of Bracton—rights himself by force, with or without a multitude of people, intrudes upon the junior patentee's actual possession proper, and keeps him out.   Now, the junior has the remedy provided for him more than five hundred years ago, and, so far as the use of actual force is concerned, it is given a construction most liberal and favorable to his right of being placed *statu quo;* and, no matter what right or title he had thereto, he may, within three years after such forcible and unlawful entry, bring his suit; have the possession thus unlawfully taken restored to him ; because, in such case, the true owner is not permitted to take the law into his own hands, and right himself.   Here no question is involved or litigated and determined except the question: Did the senior patentee with a strong hand with or without a multitude of people enter upon the junior patentee's possession, actual, proper or even constructively actual? The senior patentee, being thus turned out, and the

*statu quo* restored, may not only bring his action of ejectment, but within the time limited may bring his action of unlawful entry and detainer. And now the title as determining the right of possession again becomes necessarily involved, but, although litigated and determined, is followed by no conclusive effect in any action of ejectment thereafter brought by the losing party, plaintiff or defendant, for two reasons: *First,* because chapter 89 says so; and, *second,* because neither the title nor the right of possession as determining the ownership was involved or decided; nothing but the single point that the first entry was forcible, and therefore, unlawful, and that can not be again litigated.

Case No. 3. But as to the right between landlord and tenant—as, for example, the right of the tenant to be reinstated when unlawfully turned out by the landlord, or of the landlord to recover, when the tenant after forfeiture of his lease or after any detention without the consent express or implied of the landlord detains the possession of the land after the tenant's right has expired—in such case the right to hold as tenant or termor is directly involved; and all such questions between them as forfeiture of the term, or the right of the landlord or tenant to the possession, are necessarily involved and actually litigated and determined. The judgment is final and conclusive, except that in case of forfeiture he may, under section 17, c. 93, within one year, file his bill in equity to be relieved against such forfeiture, and be restored to such lands or tenements; and neither has any right to bring ejectment under the present law, or writ of right, as the law was before July 1, 1850, unless there is some distinct and wholly independent ground or cause of action. And the reason for its conclusiveness and finality on the question of forfeiture has already been given. First, it has nothing to do with any distinct ground for trespass or ejectment, and can be no bar to such action; and as to the remedy in equity that is expressly given, not to relitigate the question of forfeiture, but for relief against it upon the terms and within the period prescribed; and for error in the case itself the party has right of appeal to the court of last resort. The title

between landlord and tenant in such case is not involved. The forfeiture of the lease is involved, and the right of the landlord to be restored to the possession by enforcing the forfeiture by action of ejectment under section 16, c. 93, or by unlawful entry or detainer under chapter 89, as was decided in *Guffey* v. *Hukill, supra,* because the execution of the new oil lease operated as an avoidance of the first one ; and, the tenant under the first lease having taken or detained the possession after his right had expired, this Court held that this action could be used as effectually as ejectment under chapter 93.

The question of forfeiture being involved, notwithstanding the inconclusiveness of this action upon the title, the judgment in this action is final and binding as to all questions actually and necessarily litigated and determined. "It is evidence of the right and extent of the plaintiff's possession, and the defendant is estopped from contesting the same. So, also, in a special statutory class of actions called by this name, the judgment is conclusive as to the existence of the relation of landlord and tenant between the parties, and as to the tenant's unlawful holding over ; and these issues can not be again tried under color of a suit in chancery." See Black, Judgm. § 663 ; 1 Herm. Estop. § 209 ; *Norwood* v. *Kirby's Adm'r,* 70 Ala. 397.

It was the failure to bore for oil and the failure to pay the commutation money that worked the absolute forfeiture of the first lease. It was the execution of the second lease which avoided the first, being a plain and unequivocal declaration of such forfeiture, which gave the second lessee a right to enter and the right to maintain unlawful detainer against the first lessee in possession, in lieu of and with the effect of a declaration in ejectment under section 16, c. 93, Code. And "the payment of the rent or commutation money to Wise, and his consent to Hukill's taking possession under the Hays lease, could have no effect to waive the forfeiture, because such payment and taking possession occurred after the execution by Wise to Calvert of the second lease, which operated as a declaration of forfeiture, and to divest all estate under the Hays lease, and in-

vest it in Calvert; and the after-act of payment did not destroy Calvert's right." *Guffey* v. *Hukill*, 34 W. Va. 60 (11 S. E. Rep. 757).

If the judgment had been against Guffey, any question necessarily involved and actually and necessarily litigated and determined would also have been *res judicata* as to him; for "judgments in actions of forcible entry and detainer and unlawful detainer are, to the same extent as judgments in other actions, conclusive upon the questions within the issues, and determined by the court or confessed by the parties." 1 Freem. Judgm. § 302a, and cases cited. "If a judgment is in favor of a plaintiff who sues as landlord to recover of defendant for holding over, such judgment is conclusive against them of the existence of the lease and their unlawful holding over." Id., citing *Norwood* v. *Kirby's Adm'r*, 70 Ala. 397. "The title to the property is never in issue in these actions, and therefore the judgment, whether for plaintiff or defendant, can not affect the title " Id.

This is generally true, but, as we have already seen, it may affect the title to a term of years as between landlord and tenant, and those claiming under them, and determine the question of forfeiture of a lease and of an unlawful holding over, especially where it has been used as the substitute and equivalent of an action of ejectment under section 16, c. 93, Code, as was done in this case.

We have thus endeavored to show why such judgment can not and does not bar an action of trespass or ejectment. between the same parties, because the same questions are not in issue, or, if they are in issue, they affect the title to the freehold, and here the statute itself prevents it from being a bar; and for the same reason, if special facts are found, they are not to be conclusive, nor the general finding that the defendant does or does not unlawfully withhold the premises in controversy, either of which might be true, as we have seen, without affecting the merits of the subsequent action in trespass or ejectment. But, whatever may be the correctness of such explanation, it shows that it is not extended to a bill in equity, which is neither within the letter nor the reason of the statute. So that here the fact of the forfeiture of the Hays lease (first

lease) is *res judicata*, and to stir the question of such forfeiture again it must be put on some distinctly equitable ground.

The plaintiff, E. M. Hukill, in his bill alleges that the Calvert lease (called "second lease") was procured by false and fraudulent means by Calvert from Wise, the owner of the land and the lessor. The specific charge of fraud is that Calvert induced Wise, the owner, to execute to him, Calvert, the second lease; the verbal agreement being then and there made by Calvert, that he would take the same subject to the Hays lease, and that, if Hays or his assignee claimed under his lease, he, the said Rezin Calvert, would return to him, Wise, the said second lease.

This defence of fraud in the procurement of the Calvert lease defendant, Hukill, attempted to set up on the trial of the action of unlawful detainer of *Guffey* v. *Hukill*, and asked the witness Wise certain questions framed so as to embrace the charge of fraud in the present bill, but the court below ruled out the questions, and defendant excepted. See defendant's bill of exceptions, No. 5, Pr. R. 35, of *Guffey* v. *Hukill*, unlawful detainer. This ruling of the court below was assigned as ground of error in this Court (see Pr. R. Id. p. 5) and the case was decided against defendant, Hukill, on a demurrer to the evidence; so that the question was presented to this Court on that point on the strongest ground possible for E. M. Hukill, the defendant and demurree. On what ground the court below excluded this evidence does not appear, except from brief of counsel that it was an attempt to have the grantor, Wise, impeach his own deed of lease to Calvert, to contradict the written instrument by oral proof of a contemporary condition, which limited its effect, and provided for thus terminating the lease by such verbal condition subsequent. It was assigned as error and argued by counsel in this Court, but was not expressly decided.

That such defence of fraud in the procurement of the second lease could have been made at law in the action of unlawful detainer as far as it was a good defence, proved by competent witnesses, is, I think, unquestionable; but how far it can be considered as a question necessarily in-

volved in the issue, and actually and necessarily litigated and determined, is a question of great difficulty, bearing in mind the facts already stated, and the fact of the concurrent jurisdiction of courts of law and courts of equity in cases of fraud generally.

But, taking it as a question presented here for the first time upon its merits, is it a case of verbal proof of a contemporaneous agreement inconsistent with the written instrument ? If so, the appellees contend that it would violate three rules at law : (1) A rule of evidence : "Parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument." 1 Greenl. Ev. (15th Ed.) § 275. (2) It would permit a grantor, by a bare averment, to make void his own deed *Williams* v. *Green*, Cro. Eliz. 884. (3) Such testimony is contrary to the statute of fraud and perjuries, which in such cases requires the contract to be in writing. See paragraph 6, § 1, c. 98, p. 715, Code (Ed. 1891.) "Such testimony is not only contrary to the statute of frauds, but to the maxims of the common law; and the rules of evidence on this, as on most other points, are the same in courts of law and equity." ALLEN, J., in *Towner* v. *Lucas*, 13 Gratt. 705 –710.

When the second or Calvert lease was executed nothing stood in its way. The lessee under the first (Hays) lease had failed to commence to bore, and had failed to pay the commutation money; the Hays lease was, by its terms, at an end; and Wise, the land owner, could, as he did, execute the subsequent lease to Calvert, and thereby unequivocally declare the forfeiture of the Hays lease, and at the same time put it out of his power to condone or relieve such forfeiture, which has become *res judicata;* and any evidence now offered to rebut the presumption of an unequivocal declaration of forfeiture comes too late to have any effect. The same evidence is now offered by appellant for the purpose of proving that the second lease was obtained by fraud.

The Calvert or second lease is a sealed instrument, executed by lessor and lessee for a term of twenty years. The agreement of the lessee, Calvert, is contemporaneous there-

with, and proved by parol testimony of the lessor, Wise, and others. Is it inconsistent with the written instrument? The written lease, signed, sealed, and delivered to Calvert, says that it shall be for a term of twenty years, subject to certain conditions named therein. The contemporaneous parol agreement says that it may not run for twenty years, but shall come to an end, and be returned to Wise, the lessor, if and when Hays, or Hukill, his assignee, claimed the benefit of his lease. By the terms of such parol agreement, the second lease was valid, and might remain so for twenty years, but the parol agreement added a new condition, which might terminate the leasehold estate at any future time. It was not a condition precedent, necessary to give the lease validity. The lease was valid, and there was no attempt to pervert it from the purpose for which it was executed. Therefore, if there was any fraud in the procurement of the instrument, the fraud did not go to its validity; nor was there any breach of confidence in using such paper delivered for one purpose by fraudulently perverting it to another.

"It is reasoning in a circle to argue that fraud is made out when it is shown by oral testimony that the obligee, contemporaneously with the execution of the bond, promised not to enforce it. Such a principle would nullify the rule, for, conceding that such an agreement is proved, or any other contradicting the written instrument, the party seeking to enforce the written instrument according to its terms would always be guilty of fraud. The true question is, was there any such agreement? And this can only be established by legitimate testimony. For reasons founded in wisdom and to prevent frauds and perjuries, the rule of the common-law excludes such oral testimony of the alleged agreement; and, as it can not be proved by legal evidence, the agreement itself, in legal contemplation, can not be regarded as existing in fact. Neither a court of law nor a court of equity can act upon the hypothesis of fraud where there is no legal proof of it. ALLEN, J., in *Towner v. Lucas,* 13 Gratt. 705–716.

This bill, in its main purpose, takes for granted the forfeiture of the Hays lease, and prays, among other things, to

be relieved from such forfeiture. The period prescribed by the statute is twelve months, and the bill is brought within that time. Section 17, c. 93, p. 710, Code (Ed. 1891) reads as follows: "Should the defendant, or other person for him, not pay the rent in arrear, with interest and costs, nor file a bill in equity for relief against such forfeiture, within twelve months after execution executed, he shall be barred of all right in law or equity to be restored to such lands or tenements."

I have given both leases in full. They speak for themselves; so there can be no controversy as to their terms. The Hays lease seems to embrace a tract of two acres not in controversy in this suit. The controversy relates to the thirty-acre tract mentioned in both leases. The "Mount Morris oil field" lies partly in Green county, Pa., and partly in Monongalia, W. Va. In this latter part is situated the thirty acres in controversy. Plaintiff, Hukill, had been developing oil territory in this oil field about five years, taking many leases, and the first oil produced by him in the Mt. Morris oil field was in October, 1886; but before that date many oil wells had been drilled near Mount Morris, and oil produced, but not in large, paying quantities. But in May, 1889, plaintiff, Hukill, commenced boring on the thirty acres, and in November, 1889, this well yielded oil in large and paying quantities.

One of the leading cases on the doctrine of relief in equity against penalties and forfeitures is *Peachy* v. *Duke of Somerset*, 1 Strange, 447, 2 White & T. Lead. Cas. Eq. (4th Amer. Ed.) p't 2, p. 2014. "The true ground of relief against penalties is from the original intent of the case, where the penalty is designed only to secure money, and the court can give by way of recompense all that was expected or desired." * * * "From a very early period equity would at any indefinite time after a tenant had incurred forfeiture and been ejected for nonpayment of rent at a particular time, under a stipulation in his lease, relieve him upon his paying to the lessor the rent accrued interest, and costs, upon this principle: that, as the right of entry was intended merely as a security for the rent, the lessor thereby received full compensa-

tion, and was put in the same situation as if the rent had been paid to him when originally due. This principle was recognized by the legislature, which, however, remedied a palpable injustice by limiting the time within which the lessee might obtain relief by filing a bill." See 2 White & T. Lead. Cas. Eq., *supra*, p. 2026, referring to English statutes similar to sections 16, 17, *et seq.*, of chapter 93.

But equity will not relieve against forfeiture from the breach of covenants where compensation can not be made. *Gregory* v. *Wilson*, 9 Hare, 685, 689. Hence equity will not in general, and in the absence of special circumstances calling for interference, give relief in cases of forfeiture growing out of breach of covenant for repairing, insuring, or doing any specific act, because in such cases it is unknown what the measure of damages shall be. *Wafer* v. *Mocato*, 9 Mod. 112; *Reynolds* v. *Pitt*, 19 Ves. 141.

Courts of equity will not interfere in cases of forfeiture for breach of covenants and conditions to do specific things other than the payment of money, for they admit of no just compensation or clear estimate of damages; and it is a universal rule in equity never to enforce either a penalty or a forfeiture. See 2 Story, Eq. Jur. (13th Ed.) 1319–1324, and cases cited. Even "in a case where an agreement creates a mere pecuniary obligation, so that a forfeiture incurred by its breach would ordinarily be set aside, a court of equity will refuse to aid a defaulting party, and relieve against a forfeiture, if his violation of the contract was the result of gross negligence, or was willful and persistent. He who asks help from a court of equity must himself be free from inequitable conduct with respect to the same subject-matter." See 1 Pom. Eq. Jur. § 452.

These general principles "underlie all the cases which abound upon the subject, and have been canonized in the standard elementary works. They commend themselves to every man's common sense of reason and justice in view of the special objects which courts of equity have been constituted to effectuate." Justice SHARSWOOD, in *Oil Creek Railroad Co.* v. *Atlantic, etc., R. Co.*, 57 Pa. St. 65.

What is called the "Hays lease" or the "first lease," indifferently, was executed on the 30th day of June, 1886, was

by its own terms void on the first day of April, 1887, for neither the lessee nor any one claiming under him had during such period of nine months commenced to bore for oil, or had paid any part of the one dollar and thirty three and one third cents per month in lieu thereof by deposit in the hands of John Kennedy, or otherwise. No one can read this Hays lease by the light of its peculiar subject-matter and the surrounding circumstances without coming to the conclusion that boring for oil was the main purpose of the lease—that which Hays bound himself to do, and that which Wise desired, and had a right to expect, within the nine months, barring accidents and reasonable delays from unforeseen contingencies, which were provided for by the commutation money mentioned in the lease.

It was in the Mount Morris oil field, then being developed, and the boring for oil was of the essence of the contract: *First*, to get oil before it was drained and exhausted by wells on adjoining leases; *second*, one such well, as was bored in the year 1889, on the property would have paid the lessor in his royalty of one eighth the oil as much in twenty days as the commutation money would have amounted to during twenty years, the length of the whole term. If the court can say on inspection of a deed that the five dollars or ten dollars consideration is but nominal, though technically valuable, I see nothing to prevent it from saying that four or five cents per day, compared with fifteen dollars or twenty dollars per day, is a very small sum.

But it is said that one dollar and thirty three and one third cents per month is the commutation money agreed to and contracted for by the lessor himself. That is true. Such was his contract, but the contract, by failure of the lessee either to commence work or pay such sum within the nine months, has ceased to exist. Such failure, by its own terms, "has worked an absolute forfeiture of this lease," and Calvert, and the defendants who claim under him, are not willing to make a new contract of that sort, or have the old one revived on that basis; that to do so would be enforcing a penalty against them in favor of a party who was praying to be relieved from a forfeiture; relieve

him from a forfeiture resulting from his refusal or failure to do a particular thing, from its nature not compensable in damages; and forcing upon those who now have the right to refuse a compensation merely nominal, not substantial, and, under the facts of the case, very greatly inadequate.

Plaintiff, and those claiming under the forfeited Hays lease, did not commence to bore for oil or pretend to pay the back commutation money until about two years had elapsed since such lease became forfeited, and then it was a payment to Wise, who had no right to receive it. The subject-matter of the contract, and the terms of the contract of lease itself, show that time was of its very essence; and section 17 of chapter 93 of the Code, although it says that the bill in equity for relief against such forfeiture will be barred in twelve months, does not say that the party's willful and persistent refusal or neglect to perform such condition may not be considered in determining whether his case is deserving the relief prayed for, although the bill may have been filed within twelve months after execution executed.

It appears from the record that defendants Guffey and Murphy have brought against plaintiff, Hukill, an action of trespass for mesne profits, *etc.*, while Hukill occupied and used the thirty acres in controversy. This suit appears to be pending in the Circuit Court of Monongalia county. Plaintiff claims in this suit that he expended in good faith, in permanent and valuable improvements on the land in controversy, the sum of about twelve thousand dollars, while holding the land recovered from him under a title believed by him to be good, and prays that he may be allowed for the same the fair and reasonable value thereof. Inasmuch as these questions will properly arise in the suit for mesne profits, *etc.*, now pending, they are expressly left undecided in this suit.

Plaintiff also claims that a considerable amount of personal property, including one boiler, two engines, two well rigs, a large amount of tubing, sucker-rods, oi'-tanks, etc., are still on the property, the possession of which, together with the land, was delivered to defendants, which are his property, and should be paid and accounted for or delivered

to him. This question also is not passed upon, but left undecided. There is nothing in this record to enable the Court to decide either one of these questions intelligently. In other respects the decree complained of is affirmed.

BRANNON, JUDGE, (*concurring.*)

Whether the former decision is *res judicata* or not, I have no hesitation in concurring in the decision in this case, as I am decided in the opinion that the forfeiture is not relievable in equity, and that the oral evidence sought to be used to invalidate the second lease is not admissible.

ENGLISH, JUDGE, (*dissenting.*)

I am unable to concur in the conclusions reached in the foregoing opinion for the following reasons: As I understand the question presented for our consideration, it is not whether a forfeiture of the lease on the part of E. M. Hukill has occurred, but conceding that a forfeiture has occurred, how far a court of equity, under the circumstances of this case, would be warranted in relieving against such forfeiture. It is true that in the case of *Guffey* v. *Hukill,* which was an action of unlawful detainer, which came to this Court on writ of error and was decided on the 24th day of June, 1890, in which said Guffey and Murphy were claiming to be entitled to the possession of the thirty acres in the lease mentioned, this Court held in the second point of the syllabus:

"A lease for years for drilling for petroleum, oil and gas contains the following provision: 'The parties of the second part covenant to commence operations for said purposes within nine months from and after the execution of this lease, or to thereafter pay to the party of the first part one dollar and thirty three and a third cents per month until work is commenced, the money to be deposited in the hands of John Kennedy for each and every month; and a failure on the part of said second parties to comply with either one or the other of the foregoing conditions shall work an absolute forfeiture of this lease,'—and there is no covenant for re-entry, and there is failure to commence operations and to pay money in lieu thereof, and the lessor

leases to another person: Held, the first lease is thus avoided, and the second lease is a sufficient declaration of forfeiture without demand and re-entry, and that the second lessee may maintain unlawful detainer against the first lessee in possession."

This, however, was but the affirmance of a judgment at law, and under the strict rules of law a forfeiture was declared to have occurred; and the question presented is whether equity will relieve against said forfeiture under the circumstances of this case; and this question can not be regarded as *res judicata* by reason of the judgment in said unlawful detainer case, for the reason that this question was not then before the court upon this question of equitable relief, and neither David Wise nor Rezin Calvert were parties to said action. See, also, *Jenkins* v. *Harrison*, 66 Ala. 345, where it is held that "a judgment in an action at law against the validity of an instrument as a deed for want of delivery does not preclude a resort to equity to enforce it as a contract to convey."

Taylor, in his valuable work on Landlord and Tenant, (volume 2, § 495) says: "When a tenant has forfeited his lease by a breach of covenant for the payment of rents, courts both of law and equity consider the clause of re-entry to be mainly inserted for the landlord's security, and will interfere in the tenant's behalf, although all the formalities of a common-law demand may have been complied with, upon his satisfying the rent due, and making compensation for any damages which the landlord may have sustained in consequence of this omission; and in general a court of equity will relieve the tenant from a forfeiture where the breach is the result of accident or mistake, or where it has been incurred by neglecting to pay a sum of money, the interest upon which can be calculated with certainty, and the landlord thereby compensated for the inconvenience he may have sustained by the tenant's withholding payment."

In the case of *Nelson* v. *Carrington*, 4 Munf. 332, seventh point of syllabus, the Court held as follows: "Equity is not fond of taking advantage of forfeiture arising merely from lapse of time specified; on the contrary, it is the con-

stant course to relieve against such forfeitures on making adequate compensation."

And Pomeroy, in his Equity Jurisprudence (volume 1, § 453) under the head of "Forfeitures Arising from Covenants in Leases," says: "Where a lease contains a condition that the lessor may re-enter and put an end to the lessee's estate, or even that the lease shall be void upon the lessee's failure to pay the rent at the time specified, it is well settled that a court of equity will relieve the lessee, and set aside a forfeiture incurred by his breach of the condition, whether the lessor has or has not entered and dispossessed the tenant. This rule is based upon the notion that such condition and forfeiture are intended merely as, security for the payment of money."

And in note 1 he says: "By the original doctrine of equity the relief might be granted within any reasonable time after a breach, and even after an ejectment."

The record in this case discloses no privity of contract between E. M. Hukill and Guffey and Murphy. As the assignee of William Hays, the lessee of David Wise, he became the lessee of said David Wise and as such took upon himself the covenants contained in the lease, and Wise alone had the right to insist upon a forfeiture of said lease upon a failure of Hukill to comply with its conditions. It is true that said Wise subsequently leased said thirty acres of land to Rezin Calvert, who assigned the same to Ida C. and Vinnie J. Calvert, and that they assigned said lease to said Guffey and Murphy, but said Guffey and Murphy thereby acquired no right to insist upon or enforce the forfeiture of the lease on the same premises held by E. M. Hukill, as they were not the assignees of the Hukill lease, but had accepted a lease indirectly from said Wise on the same property, containing entirely different terms and conditions; and, even if they had been assignees of the same lease, we find in 12 Am. & Eng. Enc. Law, p. 758*m*, § 4, it is said:

"The right of forfeiture is waived by the landlord by acts on his part showing an intention to abandon the right. Where a right to declare the lease forfeited for the nonpayment of the rent has accrued, the acceptance of a year's

rent in advance thereafter is a waiver of the forfeiture and in such case an assignee of the lessor has no better right than the lessor."

In 8 Am. & Eng. Enc. Law, p. 447, note 6, it is said such forfeiture may be waived by any act of the landlord affirming the existence of the lease, and recognizing the lessee as tenant after knowledge of the forfeiture. *Crawford* v. *Waters*, 46 How. Pr. 210 ; *Carroll* v. *Insurance Co.*, 10 Abb. Pr. (N. S.) 166 ; *Bleecker* v. *Smith*, 13 Wend. 530 ; *Ireland* v. *Nichols*, 46 N. Y. 413.

In the case of *Watson* v. *Fletcher*, 49 Ill. 498, it was held : "Where the right had accrued to declare a lease forfeited for nonpayment of taxes which the lessee had covenanted to pay, and thereafter the lessor accepted from the lessee a year's rent in advance, and shortly after assigned the lease to another, it was held that these acts of the lessor amounted to a waiver of the forfeiture. Nor in such a case does the assignee of the lessor acquire any right to declare a forfeiture ; that right having been waived by the acts of the assignor."

Again, it is alleged in the bill, and not denied in the answer, that at the time said second lease was executed, and before said David Wise would execute the same, and as an inducement to said David Wise to execute the same, the said Rezin Calvert then and there agreed that if said Wise would execute said lease to him, he, the said Calvert, would take the same subject to the said Hays lease (under which. said Hukill claims) and that, if said Hays or his assignee claimed under said lease, he, the said Rezin Calvert, would return to said Wise said second lease; and in addition to this, said Wise, in his deposition, states that he informed said Calvert at different times of the existence of the Hukill or Hays lease, and that by executing said second lease it was not his intention to declare said Hays lease forfeited, and that he would not have executed said lease to said Calvert if he had not promised to return the same to him, if the parties claiming the Hays lease claimed it to be valid and binding; and he also states that said Hukill had purchased his royalty in said Hays lease, and that said Hukill has fully complied with the terms of said lease.

It is also proven by the wife of said Wise that Calvert was teasing her husband for weeks to get the lease ;—that she heard her husband tell him of the existence of the Hukill lease, and also that he was afraid said Calvert would get him into trouble, and for that reason he was afraid to lease said thirty acres to him, and she heard said Calvert tell her husband that he would give up said lease if Mr. Hays claimed his lease ; that she told Calvert there was a lease ahead of his, and she was afraid he would get her husband into trouble ; and he replied there was not a bit of danger in leasing to him ; that he, Calvert, would give up his lease, if they came on with the Hays lease. And the same thing, in substance, is shown by the deposition of William M. Lawless.

This evidence appears to me to be entirely competent. It only shows that the second lease was obtained by Calvert after great importunity, but with full notice of the existence of the Hukill lease, and also with notice of the fact that said Wise, so far from intending to treat said Hukill lease as forfeited, considered the same to be in full force and effect, and for that reason declined to execute the second lease, and would not have done so but for the assurance that Calvert would surrender said second lease if Hukill came on to operate his lease.

In the case of *Sweet* v. *Parker*, 22 N. J. Eq. 453, it was held : "In a suit to have a deed absolute on its face decreed to be a mortgage, parol evidence is admissible, not to establish an agreement to reconvey, which equity will enforce, but to establish the true nature of the instrument by showing the object for which it was made."

So Wharton, in the Law of Evidence (section 1057) says: "A deed, whether of realty or personalty, is subject to the rules we have already laid down in reference to contracts generally—that a conveyance absolute on its face may be shown to be a mortgage or to be in trust."

This evidence was not an attempt to vary or add to the Calvert lease, and, although it was an absolute lease upon its face, it was shown by said evidence to have been delivered subject to the condition that it was to be surrendered, if Hukill insisted on his lease and complied with its terms ;

and besides, as before stated, Wise was the only person who could insist on the forfeiture of the Hukill lease. Neither Calvert nor Guffey and Murphy were the landlords of Hukill.

We find that Washburn on Real Property (volume 1, p. 477) says: "But a covenant or condition already broken can not be assigned so as to be taken advantage of or enforced by an assignee in his own name," and again, the same author, at page 485, says: "The English and American law, as well as courts of law and equity, substantially agree in giving relief if the arrears of rent, interest and costs are paid or tendered."

In the case of *Schaupp* v. *Hukill*, 34 W. Va. 375 (12 S. E. Rep. 501) this Court held that the second lease, on which there was an indorsement as follows: "This lease to be taken subject to the Hukill lease"—was not an "unequivocal declaration of forfeiture of the first lease;" and why should such endorsement be any more effective than the verbal declaration of Wise, which is abundantly proven to have been made at the time the Calvert lease was delivered?

In the case of *Thomas* v. *Hukill*, 34 W. Va. 397 (12 S. E. Rep. 522) HOLT, J., in delivering the opinion of the Court, says:

"The execution of the second lease can not be taken as conclusive evidence of a purpose to declare the first one forfeited when its own terms show that such is not the purpose. But, if silent on the subject, as this one is, can it not be shown that the lessor executed and delivered the new lease to the lessee himself, on condition that it was to be given back if the first lessee objected. This Court, in the case of *Stuart* v. *Livesay*, 4 W. Va. 45, and in *Newlin* v. *Beard*, 6 W. Va. 110, following the case of *Ward* v. *Churn*, 18 Gratt. 812, would seem to hold such conditions valid when made known to the obligee. The admissibility of this evidence is also rested upon the doctrine of the cases of *Lawrence* v. *Du Bois*, 16 W. Va. 443, *Davis* v. *Demming*, 12 W. Va. 246, *Vangilder* v. *Hoffman*, 22 W. Va. 1, and cases cited. 'The efficacy of the parol evidence is not to establish an agreement to reconvey, the specific performance of which the

courts will enforce, but to establish the true nature and effect of the instrument, by showing the object with which it is made.' *Sweet* v. *Parker*, 22 N. J. Eq. 457. In this case it is held it is not to add to or take from the language of the lease, or to impair its legal effect, but to rebut the inference of a collateral purpose to declare a forfeiture, which otherwise would be drawn. But I pass from this point, as, in my view, it has no important bearing."

I quote this language from said opinion because it met with my hearty approval when it was handed down, and I have seen no good reason after examining many authorites to change my views upon the point; and, while it may have had no important bearing on the case of *Thomas* v. *Hukill*, it should have a controlling influence in arriving at a proper conclusion in the case at bar. Calvert surely took this lease with full notice of the existence of the Hukill lease, and of the fact that Wise did not consider it forfeited. There can be no question that compensation could be made, and therefore equity will relieve. Time was not of the essence of the contract (*Jackson* v. *Ligon*, 3 Leigh, 160); and in a note to the case of *Smith* v. *Mariner*, 68 Am. Dec. 85, we find it said:

"Forfeitures are not favored in equity, and courts lean strongly in favor of granting relief from such a harsh measure for the termination of contracts. Courts of equity will ordinarily grant relief against a forfeiture incurred by nonperformance of an agreement for the payment of money simply by setting it aside at the instance of the defaulting party, or in such other manner as may be necessary, on payment of the debt and interest and costs, unless the party has by inequitable conduct debarred himself from any relief in equity; *Bowser* v. *Colby*, 1 Hare 128; *Gregory* v. *Wilson*, 9 Hare 683; *Wadman* v. *Calcraft*, 10 Ves. 68; *Hill* v. *Barclay*, 16 Ves. 405;" and numerous other cases.

And on the next page, speaking of forfeitures of leases for breach of covenants therein, it is said: "Where the forfeiture is incurred by reason of breach of a covenant for re-entry after default in the payment of rent, relief will be granted, and the forfeiture set aside, upon payment of the rent; and this, whether the lessor has or has not dispos-

sessed the tenant.   *   *   *   Such covenants are intended merely as a security for the payment of money, and, the money being paid, the purpose of the forfeiture is gone," *etc.*

If the forfeiture in this instance would be relieved against. as between Wise and Hukill, it could not be taken advantage of by Calvert or his assignees.

Again, the questions involved in this case can not be regarded as *res judicata* as to Wise and Hays, for the reason that they were not parties to the action of unlawful detainer, and Hukill paid Hays three hundred dollars for his lease.   In the case of *Renick* v. *Ludington*, 20 W. Va. 512 (point 3 of syllabus) this Court held that the law of *res judicata* must yield in such case to the principle that a person who is not a party and has neither been heard nor had an opportunity of being heard, can not be bound by a decree prejudicial to his interest; and GREEN, J., on page 555, says:

"But, however necessary it is that this doctrine shall be upheld with a firm hand, yet it can not be permitted to overthrow or destroy another fundamental principle still more fundamental and axiomatic, and of which Judge CHRISTIAN, in his opinion in *Underwood* v. *McVeigh*, 23 Gratt. 418, thus speaks: 'It lies at the very foundation of justice that every person who is to be affected by an adjudication should have an opportunity of being heard in his defence, both in repelling the matters of fact and upon matters of law.'"

And in *Western Min. & Manuf'g Co.* v. *Virginia Cannel Coal Co.*, 10 W. Va. 250 (second point of Syllabus) it was held that to make a fact *res judicata* "it must have been directly and not collaterally in issue in the former suit, and there decided."   Other cases might be cited tending to the same conclusion, but I deem these to be sufficient to warrant me in differing from the opinion in which a majority of the Court concurred.

MODIFIED AND AFFIRMED.